UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

BEATRIS LOREDO,

Defendant.

CAUSE NO. 3:23cr45 DRL-MGG

OPINION AND ORDER

Beatris Loredo, proceeding *pro se*, requests compassionate release. The court ordered the government to respond and to provide her medical records, and the government did so. Ms. Loredo didn't reply, and the time to do so has passed. Upon consideration of the briefing and record, the court denies the motion.

The First Step Act allows a prisoner to move for a sentence reduction known as compassionate release. The court generally "may not modify a term of imprisonment once it has been imposed," but may do so when "extraordinary and compelling reasons warrant" a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). A defendant requesting release bears the burden of establishing extraordinary and compelling reasons. *See United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021). The sentencing guidelines enumerate several circumstances that may be extraordinary and compelling reasons. U.S.S.G. § 1B1.13(b). Release must satisfy the 18 U.S.C. § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021).

In March 2024, Ms. Loredo pleaded guilty to conspiring to distribute and possessing with the intent to distribute controlled substances. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846. She twice conspired to receive and distribute what she thought was cocaine from Mexico, but the

substances in fact were methamphetamine and heroin. A search of her home revealed two firearms, ammunition, and a scale and grinders (containing marijuana residue).

The court sentenced her to a term of 48 months imprisonment—below the guideline range of 57-71 months—citing her lesser role in the offense, strong employment history, and modest criminal background. When she filed this motion, Ms. Loredo had served roughly 20 months of her sentence. She is currently housed at FMC Carswell with an anticipated release date of May 3, 2027.

A prisoner must exhaust her administrative remedies. *United States v. Williams*, 987 F.3d 700, 702 (7th Cir. 2021); *see* 18 U.S.C. § 3582(c)(1)(A). The "inmate is required to present the same or similar ground for compassionate release" in both her request to the Bureau of Prisons and her motion to the court. *Williams*, 987 F.3d at 703. The exhaustion requirement "*must* be enforced when properly invoked." *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021).

The government says there is a dispute whether Ms. Loredo failed to exhaust. Her motion mentions that she petitioned the Bureau of Prisons (BOP) for compassionate release on December 3, 2025, and she included a copy of a letter and an addressed, but not postmarked, envelope [47-1]. But, says the government, there is no proof of service, and the BOP has no record of administrative requests from Ms. Loredo [50-4]. Without a reply from Ms. Loredo, the government's assertion is left undisputed.

Even if she had exhausted, Ms. Loredo hasn't established extraordinary and compelling reasons to justify early release. She has cervical and lung cancer. She says her condition is serious and could become terminal if not properly treated. Today, as guidance, she cites to two guidelines for when extraordinary and compelling reasons may exist—when a "defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory)" such as cancer

or advanced dementia, U.S.S.G. § 1B1.13(b)(1)(A), or when a "defendant is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13(b)(1)(B). She also references her rehabilitation while incarcerated. She says she received an overly harsh sentence.

Treatment notes say Ms. Loredo reported vaginal bleeding that developed in July 2024 [50-1 at 192]. An order for a pap smear was entered on July 30, 2024 [*id.* 86], and Ms. Loredo received the examination on August 1, 2024 [*id.* 85]. The results revealed abnormal cells [*id.*]. She then underwent a cervical biopsy and endocervical curettage on September 26, 2024, which revealed atypical cells [*id.* 165]. Her provider referred her for a follow-up sonography and noted that she may need a uterine biopsy [*id.* 240].

At a follow-up gynecological visit on November 15, 2024, Ms. Loredo was diagnosed with cervical adenocarcinoma in situ of the uterine cervix [*id.* 233-37]. She was referred for an MRI of her pelvis, a PET/CT scan from her skull base to mid-thigh, and radiation oncology [*id.* 234]. The imaging order from that date stated, "please schedule urgently" [*id.* 68]. The visit notes also reflect that Ms. Loredo agreed with the next steps in her treatment plan [*id.* 234].

Ms. Loredo was seen by a radiation oncologist on December 10, 2024 [*id.* 227-232]. The consultation notes state that Ms. Loredo had been diagnosed with clinical stage IIA endocervical adenocarcinoma, with a tumor measuring 5.3 x 5.1 centimeters [*id.* 228].[1] A December 6, 2024 PET scan showed no strong evidence of metastatic disease [*id.* 219-222, 228]. The radiation

---

[1] Stage IIA means that the cancer has grown beyond the cervix but has not spread into the tissue around the uterus nor to nearby lymph nodes or distant parts of the body. *Cervical Cancer Stages*, National Cancer Institute https://www.cancer.gov/types/cervical/stages? (last visited Apr. 28, 2026).

oncologist recommended daily radiation for approximately five weeks and the possibility of further treatment afterward [*id.* 231]. Ms. Loredo agreed with that plan [*id.*].

After Ms. Loredo was transferred from FCI Pekin in Illinois to FMC Carswell in Texas, she was seen at the Center for Cancer and Blood Disorders on January 8, 2025 [*id.* 200]. The provider recommended combined chemotherapy and radiation, with weekly treatment [*id.* 200-02]. Ms. Loredo had a port placed on January 17, 2025 [*id.* 188], underwent a CT scan for treatment planning purposes on January 21, 2025 [*id.* 184], and had another MRI of her pelvis on February 5, 2025 [*id.* 171]. The MRI showed no metastatic disease [*id.*]. She began chemotherapy and radiation treatment on February 4, 2025 [*id.* 165-68]. Ms. Loredo was prescribed pain medication to take as needed [*id.* 136].

Ms. Loredo continued with chemotherapy treatment [50-2 at 706, 722, 728, 734]. A follow-up MRI of her pelvis on March 24, 2025 showed that her cervical mass had decreased in size [*id.* 529]. On March 21, 2025, she underwent a procedure to remove part of the tumor and place a sleeve to facilitate radiation therapy [*id.* 686-87]. She completed chemotherapy and radiation treatment on April 10, 2025 [*id.* 14]. At a routine follow-up appointment on May 20, 2025, her provider noted that she recovered well, with no bleeding or pain, and with an oncologic follow-up appointment scheduled [*id.* 675].

Ms. Loredo was later evaluated for possible lung cancer following a CT scan on June 11, 2025 that showed a small lung nodule [*id.* 671-72]. A July 15, 2025 PET scan from her skull to mid-thigh region on July 15, 2025 detected PET-active lymph nodes in the chest but also showed improvement in a previously active area [*id.* 646-47]. The results showed no indications of metastatic disease [*id.* 647]. Ms. Loredo next underwent a bronchoscopy on August 25, 2025, which detected no malignancy, though the sample may have been poor [*id.* 526]. A November

4

2025 pathology report detected non-small cell lung cancer [*id.* 562]. Ms. Loredo was targeted for another biopsy in February 2026 following a pulmonary consultation [*id.* 175].

Ms. Loredo also had several appointments with her radiation oncologist at the Center for Cancer and Blood Disorders, including in May 2025 [*id.* 675], June 2025 [*id.* 656], July 2025 [*id.* 639, 651], and November 2025 [*id.* 584, 596]. At a November 6, 2025 appointment, the provider noted abnormal lymph nodes in her chest and increased activity in the area around her cervix [*id.* 596]. Two weeks later, she began new chemotherapy and immunotherapy medications [*id.* 586]. She had a second cycle on December 9, 2025, and a third on December 30, 2025 [*id.* 54].

Her care continued into 2026. At a January 16, 2026 appointment with a BOP provider, Ms. Loredo reported some ambulatory difficulties, like unsteadiness [*id.* 23]. She nonetheless said she was going to chemotherapy weekly and remained able to walk and perform activities independently [*id.*]. The provider referred Ms. Loredo for a physical therapy evaluation, and Ms. Loredo agreed to rehabilitative services [*id.* at 24]. At a January 13, 2026 appointment at the Center for Cancer and Blood disorders, Ms. Loredo had a biopsy and awaited a CT or PET scan scheduled at month's end, at which point she would have another appointment to discuss the findings of both the biopsy and scan and discuss next steps [*id.* 531].

Her medical condition is serious. She has been diagnosed with cancer and requires specialized care. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (medical need "serious" if physician diagnoses it as mandating treatment). The court is sympathetic to the difficulty of receiving cancer treatment, no less while incarcerated, though her care seemingly has been concerted. Serious as it is, no one reports that her condition qualifies as a "terminal illness"— that is, a "serious and advanced illness with an end-of-life trajectory." U.S.S.G. § 1B1.13(b)(1)(A). In truth, all of us have an end-of-life trajectory; there is nothing more ordinary than that we all

will die, even if the time and circumstance nearly always elude us. The illness instead must be both serious and advanced. Perhaps for this reason the guideline presupposes something more immediate by offering examples of metastatic solid-tumor cancer, end-stage organ disease, and advanced dementia when survival beyond months or even a year is unusual. *See id.*; *see also United States v. Green*, 2023 U.S. Dist. LEXIS 164166, 3-4 (N.D. Ind. Sept. 15, 2023) (acute myeloid leukemia without treatment options was extraordinary and compelling). Knowing death will happen sooner rather than eventually would typically be extraordinary and compelling "so one can pass from this life among loved ones rather than guards." *United States v. Ibarra*, 2022 U.S. Dist. LEXIS 191233, 4 (N.D. Ind. Oct. 18, 2022). She has not shown her condition to be terminal in this sense or that it substantially diminishes her ability to provide selfcare while in custody, or requires long-term or specialized medical care that is not being provided and without which she is at serious risk of deterioration or death. *See* U.S.S.G. §§ 1B1.13(b)(1)(A), (B), (C).

Medical records show she is receiving ongoing and specialized care. She has been monitored by BOP providers and outside specialists at the Center for Cancer & Blood Disorders. She has undergone diagnostic testing, imaging, chemotherapy, radiation, oncology follow-up, and additional treatment and testing when new concerns have arisen. Though she said in her motion that her cancer is stage IV, the medical records support that as recently as January 13, 2026, her diagnosis was stage IIA2 [50-2 at 525]. All cancer is serious, but nothing shows hers today to be terminal, uncontrolled, or steadily worsening despite treatment.

Ms. Loredo also says she can't choose her own doctor or obtain services or treatment she believes she needs outside BOP custody. But an inmate cannot "demand specific care" or the "best care possible" from a provider of her choice. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Ms. Loredo has

6

been treated by outside oncology specialists in Fort Worth, Texas, and she hasn't identified any necessary medical care that the BOP cannot provide or has refused to provide. *See United States v. Harper*, 2023 U.S. App. LEXIS 26190, 4 (7th Cir. 2023) (district court didn't abuse its discretion in denying defendant's motion when medical records showed the BOP was monitoring her condition and not refusing to address her cancer); *United States v. Bandy*, 2024 U.S. Dist. LEXIS 106983, 3-4 (N.D. Ind. June 17, 2024) (denying compassionate release to a defendant with blood and bone marrow cancer when medical records showed that the cancer "is stable and controlled, with regular visits occurring with oncology specialists"); *United States v. Herrera*, 2023 U.S. Dist. LEXIS 101604, 6 (N.D. Ill. June 12, 2023), *aff'd*, 2024 U.S. App. LEXIS 5501 (7th Cir. Mar. 7, 2024) (denying compassionate release to defendant with prostate cancer who was receiving regular treatment, including radiation and chemotherapy).

To the extent Ms. Loredo argues that her diagnosis or treatment was delayed, the medical records don't support that assertion. And ordinary "pauses in care or lack of expedited care…are not grounds for a sentence reduction under § 3582(c)(1)(A)." *United States v. Merritt*, 2024 U.S. Dist. LEXIS 53557, 10 (S.D. Ind. Mar. 26, 2024); *see also Forbes*, 112 F.3d at 267. The medical records reflect Ms. Loredo reported vaginal bleeding that began in July 2024—an assertion undisputed on this record. That same month, a provider ordered a pap smear, which she received in August 2024. Ater the pap smear showed abnormal results, she underwent follow up testing in September 2024. Over the next several months, she received a diagnosis, underwent additional imaging and testing, was transferred to FMC Carswell,[2] began seeing oncology specialists, and

---

[2] Federal Medical Center Carswell is described as "[a]n administrative security federal medical center." *FMC Carswell*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/crw/ (last visited Apr. 27, 2026). According to the BOP, FMC Carswell "serves as the major medical and psychiatric referral center for female inmates. All specialty areas of medicine are available at FMC Carswell, through in-house staff and community-

started chemotherapy and radiation treatment in February 2025. Since then, she has continued with oncology follow-ups and additional testing and treatment. This record reflects timely and sustained attention to her symptoms and diagnoses.

Nor has Ms. Loredo shown that her condition substantially diminishes her ability to provide self-care in custody. The court by no means minimizes the physical toll of cancer treatment or the difficulty of undergoing that treatment, whether incarcerated or at home. But Ms. Loredo doesn't identify what activities of daily living she cannot perform. And her most recent records show that, though she reported some ambulatory difficulties and unsteadiness, she also reported that she was walking, attending chemotherapy weekly, and performing activities independently. The BOP referred her for a physical therapy evaluation, and she agreed to these services. This record doesn't show that she is unable to care for herself in a correctional setting.

Ms. Loredo's situation is distinguishable from the cases on which she relies. In *United States v. Smith*, 464 F. Supp.3d 1009, 1019 (N.D. Iowa 2020), BOP medical officials had reason to suspect cancer for nearly two years before treatment began. Ms. Loredo's records reflect no comparable delay or disregard. Once she reported symptoms and abnormal testing followed, she swiftly received additional testing, diagnosis, transfer for care, and treatment. Nor do her records show that she is in the advanced stages of disease with an imminent life expectancy, as in *United States v. Schmitt*, 2020 U.S. Dist. LEXIS 2832, 9-10 (N.D. Iowa 2020).

Finally, Ms. Loredo points to reports concerning FMC Carswell and another BOP facility, FCI Butner, that describe broader concerns about the quality of medical care at these facilities. The reports don't establish an extraordinary and compelling reason for release here. The

---

based consultant specialists." Legal Resource Guide to the Federal Bureau of Prisons 2025, *U.S. Department of Justice Federal Bureau of Prisons*, 32 https://www.bop.gov/resources/pdfs/legal_guide.pdf.

compassionate release inquiry is an individualized one, and Ms. Loredo must show that her own medical conditions are not being adequately treated or cannot be managed in custody. *See United States v. Newton*, 996 F.3d 485, 491 (7th Cir. 2021) (petitioners seeking compassionate release must "submit individualized evidence rather than make generalized arguments about risk."). Generalized concerns about medical care at those facilities and reports that other inmates have received inadequate care don't establish that Ms. Loredo is receiving inadequate care.

Ms. Loredo also highlights her rehabilitation while incarcerated. She says she has maintained employment within the BOP with excellent work reports and that she has completed some programs and part of her sentence. Extraordinary and compelling reasons can exist for "[o]ther reasons" when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1.13(b)(5). This catchall provision gives the court discretion over what may qualify as extraordinary and compelling. Rehabilitation alone isn't an extraordinary and compelling reason. 28 U.S.C. § 994(t); *United States v. Peoples*, 41 F.4th 837, 842 (7th Cir. 2022). But the court may consider "rehabilitation of the defendant while serving the sentence…in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d).

Ms. Loredo is commended for her accomplishments. Maintaining employment inside, no less while undergoing cancer treatment, is no small feat. At the same time, Ms. Loredo received a sanction for being in an unauthorized area in April 2025 [50-5]. Defiance of prison rules does not indicate rehabilitation or reassure prospects of reformed respect for the law outside of a prison's walls, though perhaps her medical care since then has slowed her down. Even so, her

9

ongoing medical condition and steps toward rehabilitation don't reach the threshold of being extraordinary or compelling.

Finally, Ms. Loredo says her sentence was overly harsh and not needed to achieve the goals of § 3553(a) given her circumstances. To the extent she relies on U.S.S.G. § 1B1.13(b)(6), this provision provides that a petitioner's situation may be extraordinary and compelling if she received an "unusually long sentence," has served at least ten years of that sentence, and a change in the law has occurred that would "produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed," considering a defendant's individualized circumstances. The provision has been appropriately narrowed. *See United States v. Black*, 131 F.4th 542, 546 (7th Cir. 2025); *United States v. Thacker*, 4 F.4th 569, 571 (7th Cir. 2021). This section doesn't apply to Ms. Loredo, who points to no change in the law, and has served roughly 23 months of a 48-month sentence. And sentencing challenges aren't grounds for compassionate release. *See United States v. Martin*, 21 F.4th 944, 946 (7th Cir. 2021).

Extraordinary and compelling reasons aside, the § 3553(a) factors counsel against release. The nature and circumstances of Ms. Loredo's offense were serious. She conspired to accept large packages of methamphetamine and heroin, two drugs with devastating effects on the community. *See* 18 U.S.C. §§ 3553(a)(2)(A), (a)(2)(C). Despite a hardworking background and grounding factors in her life, including steady employment and a loving family, she reported that she so conspired to repay a favor to a drug dealer in Mexico—a concerning association. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). A search of her home also revealed paraphernalia and the very firearms and ammunition she could not possess as a convicted felon. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). These facts underscore a continued need for the sentence to reflect the offense's seriousness, promote respect for the law, deter future criminal conduct, and protect the public.

*See* 18 U.S.C. §§ 3553(a)(2)(A)-(C). Her personal circumstances invited a variance below the guideline range—thus difficult to call it harsh or outside the realm of reasonable—and it remains as appropriate today as when it was imposed. *See* 18 U.S.C. §§ 3553(a)(1), (a)(6).

CONCLUSION

Accordingly, the court DENIES the motion for compassionate release [47] and GRANTS the motion to seal [49].

SO ORDERED.

May 4, 2026                                    *s/ Damon R. Leichty*
                                               Judge, United States District Court